IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |
|---|---|
| ALYSSA WESTOVER,<br><br>        Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL<br>SECURITY ADMINISTRATION,<br><br>        Defendant. | CASE NO. 1:25-cv-1167<br><br><br>MAGISTRATE JUDGE<br>JAMES E. GRIMES JR.<br><br><br>**MEMORANDUM<br>OPINION AND ORDER** |

Plaintiff Alyssa Westover filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying disability insurance benefits and supplemental security income. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The parties consented to my jurisdiction in this case. Doc. 5. Following review, and for the reasons stated below, I affirm the Commissioner's decision.

**Procedural history**

In January 2023, Westover filed applications for disability insurance benefits and supplemental security income, alleging a disability onset date of August 15, 2022.[1] Tr. 15. In her applications, Westover claimed disability due

---

[1]    "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006). At the administrative hearing, Westover's attorney told the ALJ that she planned file a form to amend Westover's alleged onset date to April 2023, Tr. 44, but the subsequent form listed an alleged onset date

to anxiety, post-traumatic stress disorder (PTSD), obsessive-compulsive disorder, depression, and bipolar disorder. Tr. 245. The Social Security Administration denied Westover's applications and her motion for reconsideration. Tr. 72, 81, 91, 101. Westover then requested a hearing before an Administrative Law Judge (ALJ). Tr. 129.

In April 2024, an ALJ held a hearing, during which Westover and a vocational expert testified. Tr. 39–62. The next month, the ALJ issued a written decision finding that Westover was not disabled. Tr. 15–33. The ALJ's decision became final on April 11, 2025, when the Social Security Appeals Council declined further review. Tr. 1–3; *see* 20 C.F.R. § 404.981.

Westover filed this action on June 5, 2025. Doc. 1. She asserts the following assignments of error:

> 1. Whether the ALJ mischaracterized the mental health evidence and improperly substituted his own judgment for the medical opinions of the state agency physicians and plaintiff's treating mental health providers.
>
> 2. Whether the ALJ erred in failing to incorporate any physical limitations in the assessment of residual functional capacity for plaintiff's knee impairment.

Doc. 8, at 1.

---

of April 2024, Tr. 243. As a result of this discrepancy, the ALJ considered Westover's claim under the initial April 2022 alleged onset date. Tr. 15.

**Evidence**

*Personal and vocational evidence*

Westover was 33 years old on her alleged disability onset date. Tr. 211. She completed a year of college and used to work as a baker. Tr. 48, 246.

*Relevant medical evidence*

*Mental evidence*

In July 2021, Westover was hospitalized for three days at Windsor-Laurelwood Center for Behavioral Medicine after expressing suicidal ideation. Tr. 317. Westover reported increased depression following her mother's death two weeks before her hospitalization. Tr. 317. Westover advised that she had recently relapsed on cocaine, and her drug screen was positive for cocaine. Tr. 317. Her then-current prescribed mental-health medications were adjusted, her symptoms improved during her stay, and she denied suicidal ideation at the time of her discharge home. Tr. 318. Westover was diagnosed with "bipolar disorder, current episode depressed, severe, without psychotic features"; and a severe cocaine use disorder. Tr. 319.

In March 2022, Westover was hospitalized for six days at Highland Springs Hospital due to a suicide attempt and polysubstance use. Tr. 344. She reported the following stressors: her upcoming birthday and the anniversary of her mother's death. Tr. 344. She also reported "occupational issues," a relationship strain with her previous romantic partner, and "family drama." Tr. 344. Westover advised that she had relapsed on cocaine and ecstasy in May

2021. Tr. 344. At her admission, Westover's medications were adjusted and she actively participated in group therapy. Tr. 345. Westover reported a good response to the medication adjustment, and her mood and anxiety stabilized. Tr. 345. She was diagnosed with "Bipolar 1 disorder, current episode depressed, severe, without psychotic features"; PTSD; cocaine abuse; opiate use disorder, in remission; and stimulant use disorder, in remission. Tr. 345–46.

In May 2022, Westover followed up with Physician Assistant Anna Gray at Crossroads Health. Tr. 867. Westover reported feeling "really depressed," and stated that she continued to use substances, albeit less than she had been using. Tr. 867. At the time of her visit, Westover was working at a pizza restaurant and she said that she lost her last job due to substance use. Tr. 867. Westover's exam findings showed a short attention span, difficulty concentrating, and easy distractibility. Tr. 878. Westover had a depressed mood, a logical and linear thought process, an age-appropriate fund of knowledge, and no suicidal or homicidal ideation. Tr. 869. Her diagnoses included major depressive disorder, recurrent, severe, without psychotic features; amphetamine-type substance use disorder, in remission; trichotillomania (hair pulling); unspecified anxiety disorder; borderline personality disorder; and "stimulant use disorder, severe, cocaine." Tr. 869–70. Gray adjusted Westover's medications. Tr. 870.

4

In early June 2022, Westover followed up with Gray. Tr. 874. Westover reported ongoing symptoms and increased substance use. Tr. 874. She reported being frustrated because she did not get paid overtime at her new job despite having "worked 109 hours." Tr. 877. On exam, Westover had a short attention span, difficulty concentrating, and was easily distracted. Tr. 878. Her mood was "not great." Tr. 878. She had a logical and linear thought process, an age-appropriate fund of knowledge, and no suicidal or homicidal ideation. Tr. 878–79. Gray continued Westover's medications. Tr. 880.

About a week later, Westover was hospitalized at Northcoast Behavioral Healthcare after presenting for "meth and cocaine detox." Tr. 412. She also reported being homeless and was noted to have "made superficial cuts on the left wrist 'as a suicide attempt.'" Tr. 412. Westover attributed her poor medication compliance and the recent loss of her job to her substance use. Tr. 412. Westover's initial assessment noted a history of substance abuse and non-compliance with treatment. Tr. 421, 423. The providers restarted Westover on her medications. Tr. 414.

In August 2022, Westover followed up with Gray. Tr. 658, 661. Westover said that she was "[o]nly occasionally taking the medications she was prescribed in the hospital." Tr. 658. She continued to use cocaine and, intermittently, methamphetamines, and she had quit her job a week before the appointment. Tr. 658. On exam, Westover had a depressed mood, a logical thought process, impaired attention and concentration, average intelligence,

5

partial insight, and a moderately impaired ability to make reasonable decisions. Tr. 660. Gray adjusted Westover's medications. Tr. 661.

Sometime around September 2022, Westover discovered that she was pregnant, and, as a result, she became sober. Tr. 581.

In March 2023, Westover attended a psychiatric evaluation at Lake Geauga Recovery Centers. Tr. 441. Westover requested the evaluation because she was working with a caseworker to apply for disability benefits and she wasn't sure whether her diagnoses were correct. Tr. 441. On exam, Westover had a disheveled appearance, slumped posture, restless motor activity, and an anxious mood. Tr. 444. She had no attention or concentration deficits. Tr. 444. The evaluator diagnosed Westover with "stimulant use disorder, severe, cocaine" and amphetamine; major depressive disorder, recurrent, with psychotic features; generalized anxiety disorder; trichotillomania; PTSD; and borderline personality disorder. Tr. 446–47.

In May 2023, Westover followed up by video at Crossroads Health with Certified Nurse Practitioner Ebony Elam. Tr. 569. Westover had been sober for eight months. Tr. 569. She reported that she was "home with her baby and things are stressful." Tr. 569. She had stopped taking the prescribed medication Remeron because it made her sleep "too hard" and she was afraid she wouldn't wake up if her baby cried. Tr. 569. She said that her baby was doing "well and thriving," and Elam commented that, as Westover was holding her baby during their appointment, "he appears to be just that." Tr. 569. On

6

exam, Westover had a depressed mood and anxious affect. Tr. 571. She was cooperative, casually dressed, and alert with good eye contact. Tr. 571. She had intact attention and intact short- and long-term memory, and good insight and judgment. Tr. 571. Elam diagnosed Westover with unspecified mood and anxiety disorders, borderline personality disorder, trichotillomania, and uncomplicated opioid abuse. Tr. 571. Elam stopped Remeron and prescribed Latuda. Tr. 571.

In June 2023, Westover told Elam that the Latuda somewhat improved her mood overall, but that she continued to struggle with depressed days when she was not showering or completing activities of daily living. Tr. 609. She could motivate herself to take care of her baby. Tr. 609. She reported that she was isolated, explaining that she did not leave her house for days due to anxiety, lack of motivation, and interest. Tr. 609. On exam, Westover was cooperative, alert, and fully oriented. Tr. 611. She had intact attention, intact short- and long-term memory, and good insight and judgment. Tr. 611. Elam eliminated Westover's opioid use disorder diagnosis and adjusted her medications. Tr. 611–12.

The same day, Elam completed a medical source statement on Westover's behalf. Tr. 695–96. Elam found that Westover had mild, moderate, and marked limitations in her ability to do numerous enumerated work functions. Tr. 695–96. Specifically, under the "Concentrate, Persist, and Maintain Pace" heading, Elam found Westover to have moderate limitations

7

in her ability to: "initiate and perform a task that she understands and knows how to do"; "work at an appropriate and consistent pace"; "complete tasks in a timely manner"; "ignore or avoid distractions while working"; "change activities or work settings without being disruptive"; and "work close to or with others without interrupting or distracting them." Tr. 966. Elam opined that Westover had marked limitations in her ability to "sustain an ordinary routine and regular attendance at work" and "work a full day without needing more than the allotted number or length of rest periods during the day." Tr. 966. All of these opinions were in a check-box form. Tr. 965–66. When asked to identify the diagnoses and medical findings that supported her assessment, Elam wrote that Westover had major depression ("poor motivation, lack of interest, [and] feeling sad most days"). Tr. 966. Westover had bipolar disorder and struggled in building relationships with others. Tr. 966. And her generalized anxiety disorder and PTSD caused excessive worry, racing thoughts, irregular hygiene, and social isolation. Tr. 966.

In August 2023, Westover followed up with Elam. Tr. 983. Westover said that her mood was "good," and that her anxiety was "low and manageable." Tr. 983. She continued to pull her out hair, but she did so less often. Tr. 983. Elam described Westover as cooperative, alert, and fully oriented. Tr. 984. Westover had intact attention, intact short- and long-term memory, and good insight and judgment. Tr. 985. She had normal speech, intact language skills, a good mood, congruent affect, linear thoughts, and a normal fund of knowledge. Tr. 985.

Elam continued Westover's medications, although she changed Latuda to twice daily from once daily due to Westover's complaints of excessive daytime drowsiness. Tr. 983, 986.

In October 2023, Westover told Elam that she had stopped taking Latuda because she had dental work that prevented her from consuming enough calories to take the medication as prescribed. Tr. 989. Westover said that her mood had declined and she was more irritable and short-tempered. Tr. 989. Elam described Westover as cooperative, casually dressed, and alert with good eye contact. Tr. 991. Westover's mood was "worse" and her affect was "congruent, reactive, and full." Tr. 991. Westover had intact attention, intact short- and long-term memory, and good insight and judgment. Tr. 991. Elam restarted Latuda. Tr. 993.

In December 2023, Westover saw Certified Psychiatric Mental Health Nurse April DeBiasi for a psychiatric evaluation. Tr. 1056. Westover reported some depression related to being a single mother, and requested medication changes. Tr. 1056. She said that her concentration was better some days than others, and that she could focus enough to do chores and care for her son. Tr. 1056–57. She struggled with motivation to perform self-care activities. Tr. 1057. Westover reported going to breakfast with her father and grandmother on Sundays, although she still could not eat regularly because she was waiting for dentures. Tr. 1056. For this reason, she had not taken Latuda. Tr. 1057. On exam, Westover had normal eye contact, depressed mood, and appropriate

affect. Tr. 1059. She appeared disheveled. Tr. 1059. She had appropriate speech, normal thoughts, no attention or concentration deficits, and normal insight and judgment. Tr. 1059. DeBiasi prescribed Zoloft. Tr. 1057.

In March 2024, DeBiasi and Licensed Professional Clinical Counselor Drena Mongo completed a medical statement form—the same form Elam had completed—on Westover's behalf. Tr. 1035–36. DeBiasi and Mongo stated that they had treated Westover since November 2022. Tr. 1036. They found that Westover had no, mild, moderate, and extreme limitations in some of the enumerated work functions. Tr. 1035–36. Under the "Concentrate, Persist, and Maintain Pace" heading, DeBiasi and Mongo indicated that Westover had moderate limitations in her ability initiate and perform a task that she understands and knows how to do. Tr. 1036. They left the remaining seven questions in this section blank, and explained that these "were areas [they] have not been able to properly assess … in" Westover. Tr. 1034, 1036. DeBiasi and Mongo listed Westover's diagnoses as: severe stimulant use disorder; major depressive disorder with psychotic features; generalized anxiety disorder; trichotillomania; PTSD; borderline personality disorder; and "stimulant use disorder (amphetamines)." Tr. 1036.

*Physical evidence*

In early September 2023, Westover saw her primary care provider, Physician Assistant Faith Richard, and complained of left knee pain. Tr. 1006. Over-the-counter anti-inflammatories had provided moderate relief. Tr. 1006.

On exam, Westover's left knee was normal and her right knee showed bony tenderness, tenderness, and a decreased range of motion. Tr. 1007. Richard ordered left knee x-rays and prescribed Tylenol, Lidocaine cream, and Voltaren gel to be used "as needed" for pain. Tr. 1007. She also recommended that Westover apply a compressive ACE bandage, rest and elevate the painful area, and apply cold compresses intermittently as needed. Tr. 1007. Two weeks later, Westover followed up to discuss her left knee x-rays, Tr. 1004, which showed "mild osteophytosis and narrowing of the patellofemoral joint with intact medial and lateral compartments." Tr. 994. On exam, Westover's left knee showed bony tenderness, tenderness, crepitus, and a decreased range of motion. Tr. 1004.

In October 2023, Westover followed up with Richard. Tr. 994. Westover's right knee exam was normal. Tr. 996. Her left knee exam showed tenderness and bony tenderness, but no crepitus or medial joint line tenderness and a normal range of motion. Tr. 996. Richard advised Westover to schedule an appointment with an orthopedist. Tr. 996.

In January 2024, Westover saw Richards and reported pain and swelling in her right knee. Tr. 1022. On exam, Westover's left knee showed bony tenderness, tenderness, crepitus, and decreased range of motion. Tr. 1024. Westover's right knee showed bony tenderness, tenderness, and decreased range of motion. Tr. 1024. Westover had no medial joint line tenderness in either knee. Tr. 1024. Richard prescribed Tylenol "as needed" for

left knee pain and ordered right-knee x-rays, Tr. 1025, which showed minimal patellofemoral osteoarthritis. Tr. 1115.

In March 2023, Westover saw Physician Assistant William Manzeo in the orthopedics department for knee pain. Tr. 1082. Westover said that her left knee started hurting about eleven months before the appointment, after the birth of her son, and that her right knee began hurting a few months after that due to her compensating for her left knee pain. Tr. 1083. Westover reported that the pain in her left knee was much worse than the pain in her right knee. Tr. 1083. She rated her pain a "5" and said that it was made worse with walking, bending, and navigating stairs. Tr. 1083. On exam, Westover had a normal gait and no swelling. Tr. 1083. She had a full range of motion in both knees; full strength in her right knee; and slightly decreased strength during flexion and extension in her left knee. Tr. 1083. Westover had intact sensation, slight tenderness to palpation over her left quadricep tendon, and a positive patellar grind test. Tr. 1083. Manzeo reviewed Westover's x-rays and assessed Westover with left knee patellofemoral syndrome. Tr. 1084. He prescribed physical therapy and over-the-counter Aspercream for pain. Tr. 1084. Manzeo recommended that Westover buy an over-the-counter knee brace for extra support, provided home stretching exercises, and advised Westover to avoid kneeling, squatting, sitting in low chairs, running, and jumping. Tr. 1084. Westover was to follow up as needed. Tr. 1084.

*State agency opinions*[2]

In April 2023, Aroon Suansilppongse, M.D., reviewed Westover's record. Tr. 65–70. Regarding Westover's residual functional capacity (RFC),[3] Dr. Suansilppongse found that Westover could understand, remember, and carry out simple and detailed instructions. Tr. 68–69. "Her anxiety and depressive reaction would occasionally interfere with her ability for sustained concentration, persistence or for task completion. However, [she] would be able to complete tasks at an acceptable pace." Tr. 69. Westover's "social avoidance and infrequent episodes of irritability and impulsive[ness], hair pulling, or self-injurious behavior would occasionally interfere with her ability to interact appropriately with supervisors, coworkers or the public. However, she would be able to complete tasks with infrequent contact with others." Tr. 69. Dr. Suansilppongse opined that Westover's "transient cognitive dysfunction, anxiety and depressive reaction as well as polysubstance use would

---

[2]     When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

[3]     An RFC is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it's the SSA's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

occasionally interfere with her ability to set realistic goals or make plans independently of others." Tr. 70. Dr. Suansilppongse stated that his findings included consideration of Westover's "[h]istory of [suicidal ideation], irritability, poor insight/judgement and substance use." Tr. 69–70.

In August 2023, Ann Lovko, Ph.D., reviewed Westover's record and agreed with Dr. Suansilppongse's findings. Tr. 83–88.

*Hearing testimony*

Westover, who was represented by counsel, testified at the administrative hearing held in April 2024. Westover confirmed that she was clean and sober, and agreed that her mental health had improved since achieving sobriety. Tr. 49. Nevertheless, stress and anxiety still caused her to pull out her hair as a form of self-harm. Tr. 49. Sometimes she could avoid hair-pulling by employing coping skills that she learned in therapy. Tr. 50. Westover stated that she always got out of bed to care for her son, but that when her son napped, Westover at times would go back to bed, feeling depressed. Tr. 50. She tried to shower at least three times a week, but sometimes "it doesn't happen." Tr. 52. Her memory is "not that great." Tr. 51.

Westover stated that she experiences knee pain. Tr. 53. Her father comes to her home to help her take the garbage out, because to do so requires navigating stairs. Tr. 53. He also helped Westover carry groceries up the steps. Tr. 53. Westover regularly washes dishes and cooks. Tr. 53, 55. It might take her a week to clean the house, but she "gets [it] done." Tr. 53. Westover stated

14

that, at the time of the hearing, she had an upcoming appointment to start physical therapy to rebuild the muscles around the top of her knee. Tr. 53–54.

The ALJ discussed with the vocational expert Westover's past work as a baker. Tr. 58–59. The ALJ asked the vocational expert to determine whether a hypothetical individual with the same age, education, and work experience as Westover could perform Westover's past work or any other work if the individual had the limitations assessed in the ALJ's RFC determination, described below. Tr. 59–61. The vocational expert answered that such an individual could not perform Westover's past work, but could perform the following jobs: industrial cleaner, kitchen helper, and hospital cleaner. Tr. 61.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

> 1.  The claimant has engaged in substantial gainful activity since August 15, 2022, the alleged onset date, as follows: in the first quarter of 2023 only (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).
>
> 2.  The claimant has the following severe impairments: major depressive disorder, generalized anxiety disorder, borderline personality disorder, post-traumatic stress disorder, trichotillomania, and polysubstance use disorders (20 CFR 404.1520(c) and 416.920(c)).
>
> 3.  Even with the claimant's substance use, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

15

4. After careful consideration of the entire record, the undersigned finds that, based on all the impairments, including the substance use disorder, the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is able to understand and remember simple and detailed instructions. The claimant is able to carry out simple and detailed instructions. There would be occasional interference with her ability for sustained concentration, persistence, or task completion. However, the claimant would be able to complete tasks at an acceptable pace. There would be occasional interference with her ability to interact appropriately with supervisors, coworkers, or the public. However, she would be able to complete tasks with infrequent contact with others. There would be occasional interference with her ability to set realistic goals or make plans independently of others.

5. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

6. The claimant is a younger individual age 18-49 (20 CFR 404.1563 and 416.963).

7. The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

8. The claimant's acquired job skills do not transfer to other occupations within the residual functional capacity defined above (20 CFR 404.1568 and 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity based on all the impairments, including the substance use disorder, there were no jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1560(c), 404.1566, 416.960(c) and 416.966).

10. If the claimant stopped the substance use, the remaining limitations would cause more than a minimal impact on the claimant's ability to perform basic work activities; therefore, the claimant would have a severe impairment or combination of impairments (20 CFR 404.1522 and 404.922).

11. If the claimant stopped the substance use, the claimant would not have an impairment or combination of impairments that meets or medically equals the severity of one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(f) and 416.994(b)(5)(i)).

12. After careful consideration of the entire record, the undersigned finds that, if the claimant stopped the substance use, the claimant has had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is able to understand and remember simple and detailed instructions. The claimant is able to carry out simple and detailed instructions at an acceptable pace. She can interact with coworkers and supervisors on an occasional and superficial basis in a non-public setting (no jobs duties requiring direct interaction with the public). She can work in a setting where job duties change infrequently.

13. The claimant is still unable to perform past relevant work (20 CFR 404.1565 and 416.965).

14. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

15. If the claimant stopped the substance use, considering the claimant's age, education, work experience, and residual functional capacity, there have been jobs that exist in significant numbers in

the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c) and 416.966).

16. The substance use disorder is a contributing factor material to the determination of disability because the claimant would not be disabled if she stopped the substance use (20 CFR 404.1520(g), 404.1535, 416.920(g) and 416.935). Because the substance use disorder is a contributing factor material to the determination of disability, the claimant has not been disabled within the meaning of the Social Security Act at any time from the alleged onset date through the date of this decision.

Tr. 15–33.

### Standard for Disability

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1.   Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2.   Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

18

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id.* "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

**Standard of review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record."

19

*Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (citations omitted). The substantial evidence standard "is not high." *Id*. at 103. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 587 U.S. at 99.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

*1. The ALJ did not err when evaluating Westover's mental impairments*

Westover argues that the ALJ mischaracterized the mental health evidence and substituted his own judgment for the opinions in the record. Doc. 8, at 10. The basis for Westover's argument is the ALJ's finding regarding Westover's concentration, persistence, and pace abilities. *Id*. at 11–14.

*a. Legal standard for substance use and the ALJ's findings*

Under the Social Security Administration's drug addiction and alcoholism policy (DAA), the ALJ must determine whether a claimant's substance abuse "is a contributing factor material to the determination of disability." Soc. Sec. Ruling 13-2p, 2013 WL 621536, at *4 (Feb. 20, 2013). Substance abuse *is not material* to the disability determination if the claimant, without drug or alcohol use, would still be disabled. *Id*. Conversely, substance abuse *is material* to the disability determination if the claimant, without drug or alcohol use, would not be disabled. *Id*.

Here, the ALJ found that Westover's "substance use disorder was a contributing factor material to the determination of disability because the claimant would not be disabled if she stopped the substance use which she eventually did on or about September 19, 2022." Tr. 23. In so finding, the ALJ detailed Westover's pre-sobriety history, including Westover's hospitalizations and objective exam findings. Tr. 22–23. Specifically, the ALJ remarked that on three occasions, providers observed Westover to have impaired attention and

21

concentration. Tr. 22–23 (ALJ's decision stating that while using cocaine and methamphetamines: in May and June 2022, Westover "had difficulty concentrating, was easily distracted, and had a short attention span"; and in August 2022, Westover's "attention and concentration were impaired").

Later in the decision, the ALJ detailed Westover's post-sobriety records, including the improvements Westover experienced in her mental health symptoms. Tr. 28–29. Specifically, the ALJ remarked that on four occasions, providers observed Westover to have intact attention. Tr. 28–29 (the ALJ stating the following: in May, August, and October 2023, Westover "was alert[,] her attention was intact [and] her memory was intact"; and in December 2023, "her cognition including attention and concentration was within normal limits"). In fact, on one of these occasions, Westover retained normal attention and concentration even though she had stopped taking her mental health medications. Tr. 29. In other words, the ALJ detailed the evidence of record showing that after Westover became sober, her attention and concentration improved. Tr. 30 (the ALJ explaining that Westover's post-sobriety evidence was consistent with the ALJ's RFC findings because, in part, Westover "was consistently alert and her attention was consistently intact [and] her memory was consistently intact").

The ALJ also evaluated the state agency reviewers' opinions. To recap, the reviewers opined that Westover's "anxiety and depressive reaction would occasionally interfere with her ability for sustained concentration, persistence

or for task completion." Tr. 69, 87. In support of their finding, the reviewers cited Westover's "[h]istory of [suicidal ideation], irritability, poor insight/judgement and substance use." Tr. 69, 87. The ALJ commented that "[b]oth consultants noted that substance abuse was documented, but [that] a DAA material determination was not required because the claimant was determined 'not disabled.'" Tr. 23; *see* Tr. 71, 89. The ALJ wrote:

> However, the undersigned finds that the claimant's substance use disorder was a contributing factor material to the determination of disability because the claimant would not be disabled if she stopped the substance use which she eventually did on or about September 19, 2022 (see Finding #12). While the claimant has been clean and sober since about September 19, 2022, prior to that, the undersigned finds that her substance use disorder was a contributing factor material to the determination of disability.

> The consultant's medical findings, including occasional interference with the ability for sustained concentration, persistence, or task completion, are persuasive because they are supported by the mental status examinations of the claimant by Ms. Gray of Crossroads (see above). Their medical findings are persuasive because they are consistent with the course of mental health treatment recounted above including admissions to Windsor-Laurelwood, Highland Springs, and NBH (see above).

Tr. 23–24. Later in his decision, the ALJ again evaluated the state agency reviewers' opinions, this time covering Westover's post-sobriety period. The ALJ explained:

> Their medical findings are less persuasive now because they are not adequately supported by the

23

mental status examinations of the claimant by Ms. Elam of Crossroads recounted above. Their medical findings are less persuasive now because they are not consistent with the limited course of treatment recounted above and the claimant's ability to care for her one-year-old child. Instead, the undersigned finds the claimant … can understand and remember simple and detailed instructions; can carry out simple and detailed instructions at an acceptable pace; can interact with coworkers and supervisors on an occasional and superficial basis in a non-public setting (no jobs duties requiring direct interaction with the public); and can work in a setting where job duties change infrequently.

Tr. 31–32.

### b. Westover's arguments

Westover argues that the ALJ erred when evaluating the state agency reviewers' opinions because the reviewers "expressly attributed the limitation in concentration, persistence, and pace to anxiety and depressive reaction," rather than substance use. Doc. 8, at 11. But the ALJ acknowledged this. Tr. 31. He therefore did not "mischaracterize" the reviewers' findings, as Westover alleges. Doc. 8, at 11. The ALJ went on to explain that in finding the reviewers' opinions less persuasive, he relied on Westover's exam findings "recounted above," Tr. 31, which showed that Westover had concentration and attention problems when she was using drugs but that she did not have concentration and attention problems when she was not using drugs. Tr. 22–31. The ALJ's characterization of the record is accurate, and his citation of it supports his reasoning.

Next, Westover alleges that the ALJ "minimize[d]" her "consistent evidence of persistent symptoms," Doc. 8, at 11 (citing Westover's "depressed and 'worse' mood (Tr. 983, 991); depressed mood and anxious affect (Tr. 571); increased anxiety, crying spells, and racing thoughts (Tr. 569); disheveled, restless, and anxious presentation (Tr. 444); days spent in bed and expressing ongoing worry (Tr. 618); and ongoing struggles with hygiene, ADLs, isolation, poor sleep, and trichotillomania (Tr. 52, 609, 953, 983)").

Westover's argument fails. First, she misconstrues some of the records. She cites the transcript at page 983 as showing Westover's "depressed" and "worse" mood. Doc. 8, at 11. But this record, from August 2023, shows that Westover "reports her mood as 'good' and anxiety as low and manageable." Tr. 983. This record does not support Westover's argument.

The next record Westover cites, transcript page 991, is from an October 2023 appointment in which Westover reported that her mood was "worse." Tr. 991. But she also reported that she had stopped taking her prescribed Latuda due to her decreased calorie intake resulting from dental work. Tr. 989. The ALJ commented on this record—both Westover's "worse" mood and her inability to take her prescribed medication. Tr. 29. In doing so, the ALJ did not "minimize[e]" Westover's symptoms, as Westover alleged; rather, he contextualized them.

Westover cites transcript page 618 as showing "days spent in bed and expressing ongoing worry." Doc. 8, at 11. This April 2023 therapy note, for

25

interpersonal relationship counseling, shows that Westover was anxious, Tr. 618, and expressed "worrisome thoughts and feelings surrounding parenting," Tr. 619. She did not report spending "days … in bed." The ALJ noted that in April 2023, Westover experienced anxiety about her newborn baby. Tr. 27–28. The ALJ also remarked on Westover's report, in June 2023, of "depressed days when she was not showering or completing activities of daily living" and isolating. Tr. 28. The ALJ noted that, as a result of Westover's reports, Elam adjusted Westover's medication, to which the following month Westover reported a good response. Tr. 28. The ALJ also acknowledged Westover's struggles with hair-pulling, including that Westover in August 2023 reported "doing it less." Tr. 28. Westover has not shown that the ALJ's characterizations of the evidence was inaccurate. To the extent Westover complains that the ALJ failed to cite every mental status exam finding in the record, such an argument would fail. *See Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004) ("An ALJ need not discuss every piece of evidence in the record for his decision to stand.").

Next, Westover challenges the ALJ's evaluation of the two opinions authored by her treating providers: Elam, and DeBiasi and Mongo. Doc. 8, at 12. She states that the "[t]he ALJ did not meaningfully analyze these opinions in the light of the corroborative state agency evidence." *Id*. at 13. The ALJ analyzed the opinions and found them to be "not fully persuasive," describing what evidence supported his reasoning. Tr. 30. Westover hasn't challenged any

of the ALJ's findings[4] or explained what about the ALJ's analysis she believed was "not meaningful." *Id*. at 13. To the extent Westover criticizes the ALJ for failing to compare the providers' opinions with the state agency reviewers' opinions, she hasn't cited legal authority stating that an ALJ is required to undertake such a comparison. *See, e.g., Sallaz v. Comm'r of Soc. Sec.*, No. 23-3825, 2024 WL 2955645, at *6 (6th Cir. June 12, 2024) ("Sallaz identifies no authority limiting ALJs to relying on a rebuttal medical opinion when" evaluating the persuasiveness of opinion evidence).

Finally, Westover has not shown that the ALJ's rejection of the opinion evidence meant that he "substitute[d] his lay opinion for medical judgment," as she alleges. Doc. 8, at 13; *see Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401 (6th Cir. 2018) ("[the Sixth Circuit] ha[s] previously rejected the argument that a residual functional capacity determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ.").

---

[4]     Later in her brief, Westover writes that the ALJ cited in part "Westover's ability to provide basic care for her child as a basis for discounting the opinion evidence regarding her concentration." Doc. 8, at 13. She argues that "an individual's ability to perform limited activities is not substantial evidence that her symptoms are not disabling." *Id*. But the ALJ didn't find that Westover's ability to care for her child meant that she wasn't disabled. Rather, the ALJ found that Westover's ability to care for her child was inconsistent with Elam's opinion that Westover had "marked" concentration deficits. Tr. 30.

*2. The ALJ did not err when evaluating Westover's knee impairment*

Westover argues that the ALJ erred when he found that Westover's knee impairment was "not severe" at step two. Doc. 8, at 14. She also argues that, even if the ALJ did not err at step two, he erred because he didn't account for Westover's knee impairment in his RFC assessment. *Id.*

At step two of the sequential evaluation, the ALJ determines whether a claimant has a "severe" impairment. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). A *severe* impairment is one that significantly limits the claimant's physical or mental ability to do "basic work activities." *See* 20 C.F.R. § 416.920(c). An impairment is "not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243, n.2 (6th Cir. 2007) (quoting *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988)). When an ALJ finds *severe* and *non-severe* impairments at step two and continues with the subsequent steps in the sequential evaluation process, any error at step two is harmless. *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (the failure to find an impairment severe at step two is harmless error when the ALJ continues through the remaining steps of the evaluation and can consider non-severe impairments when assessing an RFC); *see Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) ("The fact that some of Anthony's impairments were not deemed to be severe at step two is…legally irrelevant"

28

because the ALJ considered Anthony's severe and non-severe impairments in the remaining steps of the analysis) (citing *Maziarz*); *see also Hedges v. Comm'r of Soc. Sec.*, 725 F. App'x 394, 395 (6th Cir. 2018). "After an ALJ makes a finding of severity as to even one impairment, the ALJ 'must consider the limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009) (quoting Soc. Sec. Ruling 96-8p, 1996 WL 374184, at *5).

Here, the ALJ at step two extensively discussed Westover's knee impairment and found that it was not severe. Tr. 18–19. Westover alleges that the ALJ's conclusion "is not supported by substantial evidence as [her knee impairment] caused more than a minimal limitation in functioning." Doc. 8, at 14. But she doesn't challenge any of the ALJ's findings; she only cites three exam findings and x-ray evidence, which the ALJ considered. *Id*. She asks this Court to make a medical determination about arthritis and cites a medical website in support, *id.*, but "[i]t is not for ... the court to research medical journals to determine possible limitations resulting from these identified diagnoses and impressions," *see Myslinski v. Colvin*, No. 14-2592, 2015 WL 12556310, at *17 (S.D. Tex. July 30, 2015), *report and recommendation adopted*, 2015 WL 12586078 (S.D. Tex. Aug. 17, 2015). Moreover, "[t]he mere diagnosis of [a condition] ... says nothing about the severity of the condition." *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988); *see Baker v. Colvin*, No. 1:15-cv-910, 2016 WL 4128435, at *13 (N.D. Ohio Aug. 3, 2016) (a diagnosis alone

does not establish that a condition is disabling, nor does it establish the extent, if any, of the functional limitations caused by the condition.").

Westover has not shown that the ALJ erred at step two.

Westover submits that, "even if non-severe, the ALJ had a duty to incorporate appropriate restrictions in the [RFC] assessment" to account for Westover's knee impairment. Doc. 8, at 14. But this is not so. Rather, the ALJ must *consider* all non-severe impairments when assessing the RFC. *See* 20 C.F.R. § 404.1545(e) (the Agency "will *consider* the limiting effects of all [a claimant's] impairment(s), even those that are not severe, in determining [the] residual functional capacity.") (emphasis added). And, as the Commissioner points out, the ALJ stated that he "consider[ed]" Westover's impairments and symptoms. Doc. 10, at 23–24; *see* Tr. 21, 27. Moreover, in his summary of the law, the ALJ expressly stated that he was required to follow Social Security Ruling 96-8p by considering all of Westover's impairments, even those "that are not severe." Tr. 17; *see Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 851–52 (6th Cir. 2020) (affirming when "the ALJ specifically noted in her summary of the applicable law that she was required to comply with SSR 96-8p's mandate to 'consider all of the claimant's impairments, including impairments that are not severe'" and discussed at step two the non-severe impairment). Westover has not rebutted the Commissioner's argument or claimed otherwise—she only argues that the ALJ was required to include limitations in the RFC to account for her non-severe knee impairment. So even if the ALJ

30

erred at step two, which Westover has not shown, she has also not shown that any such error would not be harmless.

**Conclusion**

For the reasons explained above, I affirm the Commissioner's decision.

Dated: January 20, 2026

/s/ James E. Grimes Jr.
James E. Grimes Jr.
U.S. Magistrate Judge